**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. :**

**SECURITIES AND EXCHANGE COMMISSION,**

                 **Plaintiff,**

**v.**

**STIEFEL LABORATORIES INC. and**
**CHARLES W. STIEFEL,**

                 **Defendants.**

_____/

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

    Plaintiff Securities and Exchange Commission alleges as follows:

**I.**     **INTRODUCTION**

    1.      From November 2006 through April 2009, Defendant Stiefel Laboratories Inc. ("Stiefel Labs" or "Company"), at the time the world's largest private manufacturer of dermatology products, defrauded shareholders out of more than $110 million, at the direction of Defendant Charles W. Stiefel, its then chairman and CEO.  The Defendants carried out this fraudulent scheme by purchasing stock, mainly from current and former employees, at severely undervalued prices.  To most shareholders, the Defendants did not disclose material, nonpublic information that would greatly affect the value of Stiefel Labs' stock.  For example, in late 2008 and early 2009 while purchasing shares for less than $16,500 a share, the Defendants did not inform them that Stiefel was in the midst of negotiating the sale of the Company for more than $68,000 per share (more than 300% higher than the prices Stiefel Labs paid to buy back shares from its shareholders).

    2.      The Defendants purchased substantial amounts of the Company's stock at artificially low prices by purchasing shares from current and former employees through Stiefel

Labs' Employee Stock Bonus Plan ("Plan") and certain direct transactions between the Company and shareholders. Stiefel Labs' stock did not trade on the public markets, so the Company's purchases were essentially the exclusive way for current and former shareholders to liquidate their Stiefel Labs stock.

3.     The Defendants claimed they made purchases from current and former employees through the Plan at the stock's existing fair market value. The Defendants purportedly fulfilled this obligation by retaining a third party to value the shares. However, the Defendants failed to disclose to the third party material, nonpublic information crucial to valuing the stock. For example, they failed to disclose much higher equity valuations by five investment firms, offers to purchase the Company, an investment by one of the five investment firms at a much higher equity valuation, and that the Defendants were actively shopping the Company for sale to large pharmaceutical companies. The Defendants did not, as they should have, incorporate into the valuations or update the valuations with this highly significant information. Consequently, the valuations were artificially low, which allowed the Company to repurchase shares at artificially low prices. Moreover, without any valid basis, the Company also made purchases directly from shareholders outside of the Plan at a further discount to the artificially low prices offered through the Plan.

4.     The Defendants benefitted greatly from their scheme. Each time Stiefel Labs purchased stock back, it saved considerable money by not paying the shareholders the fair market value of their stock under the Plan. Stiefel Labs distributed a portion of the common stock it purchased from the shareholders to its senior officers and employees, including shares to Stiefel and his two sons as compensation, and retired or cancelled the rest. Furthermore, the remaining

shareholders, such as Stiefel and his family, stood to make even more money when they sold the Company.

5.      By engaging in the conduct described in this complaint, the Defendants violated Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act"). [15 U.S.C. §§ 78j(b) & 17 C.F.R. § 240.10b-5]. In addition, Stiefel aided and abetted Stiefel Labs' violations of Section 10(b) and Rule 10b-5 of the Exchange Act.

## II.    **DEFENDANTS**

6.      During the relevant time period, Stiefel Labs was a private closely-held corporation incorporated in Delaware and headquartered in Coral Gables, Florida.   On July 22, 2009, GlaxoSmithKline plc ("Glaxo") acquired Stiefel Labs.  The Company is now a wholly-owned Glaxo subsidiary headquartered in North Carolina.  Prior to the acquisition, Stiefel Labs was the world's largest private manufacturer of dermatology products, with yearly revenues of nearly $1 billion and approximately 4,000 employees.  Stiefel and his family owned the majority of Stiefel Labs' shares.

7.      Stiefel, age 61, resides in Raleigh, North Carolina.  During the relevant time period he resided in the Southern District of Florida.  He has been a licensed attorney in the state of New York since 1975.  On January 7, 2010, the board of a publicly-traded medical device company appointed Stiefel to its board.  He resigned from this board on February 25, 2011.  Since March 2010, he has been a senior advisor to a private equity firm headquartered in Lake Forest, IL.

8.      Stiefel held a number of positions with Stiefel Labs until Glaxo acquired the Company: (1) from 1982 to 1995, he served as Stiefel Labs' general counsel; (2) from 1975 until July 2009, he was a member of Stiefel Labs' board; (3) from 1995 to 2001, he was the Company's president; (4) from 2001 to July 2009, he was Stiefel Labs' chairman and CEO; (5)

from 2001 to July 2009, he headed Stiefel Labs' domestic business; (6) from April 2006 to July 2009, he headed its international business; (7) from 2001 to October 20, 2008, he was trustee of the Plan; (8) from 2001 to April 2009, he was a member of the Plan Committee that oversaw the operations of the Plan; (9) he and his two sons were the only members of Stiefel Labs' compensation and executive committees; and (10) beginning in 2006, he was Stiefel Labs' controlling shareholder and had the power to appoint a majority of the Company's directors.

## III.     JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act.  [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

10.     The Court has personal jurisdiction over the Defendants and venue is proper in the Southern District of Florida because many of the acts and transactions constituting the violations alleged in this complaint occurred in the Southern District of Florida.  Stiefel resided in the Southern District of Florida and the principal office of Stiefel Labs was located within the Southern District of Florida.

11.     The Defendants, directly and indirectly, have made use, in the United States, of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, and/or the mails, in connection with the acts, practices, and courses of business set forth in this complaint.

## IV.     FACTUAL ALLEGATIONS

### A.  Stiefel Labs' Employee Stock Program and Valuation Practices

12.     The Stiefel family founded Stiefel Labs in 1847 and began to develop some of the world's first medicated soaps and dermatology products in 1946.  Throughout the years, the Company has remained privately-held, and since 1952, the Stiefel family has been the majority

shareholder.  The Stiefel family has led the Company since its creation.

13.	Beginning in approximately 1975, Stiefel Labs' employees began acquiring Stiefel Labs common stock as part of the Plan, a defined contribution plan under the Employee Retirement Income Security Act.  All Stiefel Labs employees located in the United States became participants in the Plan after their first year of employment.

14.	Each year, Stiefel Labs made discretionary contributions to the Plan in the form of Stiefel Labs stock or cash.  From 1975 to 2008, the Company made contributions of stock, but in 2008, for the first time in its history, the Company contributed only cash.  The Plan held the shares in a trust fund, and Stiefel Labs allocated contributions to employee accounts based on length of employment and compensation.  Certain shareholders, such as employees located outside of the United States, also received shares outside of the Plan.

15.	The Plan was controlled and managed by a trustee and a committee, both selected by Stiefel Labs' board.  Stiefel served as the trustee of the Plan from 2001 until October 20, 2008, and owed numerous fiduciary duties to the participants under the terms of the Plan, such as voting their shares and managing the Plan for their benefit.  As the trustee, Stiefel also had the responsibility to determine in good faith the fair market value of the shareholders' common stock.

16.	Stiefel was elected trustee of the Plan several times, the last time on August 19, 2008.  But he and his two sons appointed a replacement on October 20, 2008.  Neither Stiefel Labs nor Stiefel informed the vast majority of shareholders that Stiefel was no longer serving as the trustee, and did not disclose the replacement's name until June 2009 in a new Summary Plan Description (after the sale to Glaxo had been announced).

17.	In addition to his role as the Plan trustee and Stiefel Labs' CEO and chairman, Stiefel was largely responsible for communicating with Stiefel Labs' shareholders.  From August

2006 to April 2009, Stiefel was also on the Plan Committee, which had overall responsibility and authority to administer the Plan and to make certain the Plan operated in accordance with the law.

18.     To determine the price Stiefel Labs would pay shareholders for stock buybacks, Stiefel Labs engaged a third-party accountant who relied on the Company's financial statements and other information Stiefel Labs gave him.  Each year, Stiefel Labs engaged this third-party accountant to perform a valuation as of March 31 of that year (Stiefel Labs' fiscal year ended on March 31).  However, this third-party accountant used a flawed methodology and was not qualified to perform the valuations.  Late each calendar year, Stiefel communicated in writing to shareholders the price the third party had determined for Stiefel Labs' stock.

19.     Although the Plan required Stiefel to determine the fair market value of Stiefel Labs' stock from time to time as was necessary for any purpose under the Plan (including for stock buybacks), the Defendants never requested any valuation, as they should have, to be performed other than as of March 31 of each year.  Also, the Defendants failed to disclose to the third party they used to value the Company's stock crucial information about offers and valuations the Company received from investment firms.

20.     Moreover, throughout the relevant time period, the Defendants led employees to believe the Company would remain private.  For decades, Stiefel's father and uncle (who ran Stiefel Labs) refused to even entertain offers to sell the Company and repeatedly communicated that to shareholders.  Stiefel did not communicate anything different to shareholders so they had no reason to believe that under Stiefel's leadership the Company might have been for sale.  Further, in late 2008, the Defendants posted numerous documents (including draft corporate strategic plans, division strategic plans, and situational analyses) on its internal corporate website, which stated Stiefel Labs would be privately-held and family-owned in fiscal year 2010 (which

6

ran from April 1, 2009 to March 31, 2010).

### B. Stiefel Labs' Purchases at Artificially Low Valuations

#### 1. 2006 Valuation

21.     After Stiefel took control of Stiefel Labs' global operations in April 2006, Stiefel Labs engaged a financial adviser to explore interest from private equity firms in a potential investment in the Company.  This financial adviser contacted various parties regarding a potential purchase of at least $200 million in Stiefel Labs convertible preferred stock.

22.     On September 29, 2006, Stiefel, as Chairman, CEO and President of Stiefel Labs, emailed to all present and future participants in the Plan that he was pleased to announce to his fellow shareholders that the annual valuation had determined their shares were each worth $13,012 a share as of March 31, 2006.

23.     Several weeks later, however, in November 2006, five prominent investment firms made offers to acquire $200 million of Stiefel Labs preferred stock based on equity valuations more than 50% to 200% higher than the $13,012 equity valuation Stiefel Labs used for buybacks. The Defendants failed to disclose these offers to shareholders, or to the third party they used for valuations.  In addition, the Defendants failed to update the buyback valuation, as they should have, to reflect this important information.  Notably, Stiefel Labs chose not to proceed with a private equity investment, in part because it did not believe the investment firms were assigning a high enough valuation to the Company.

24.     From at least November 2006 through April 2007, Stiefel Labs, at the direction of Stiefel, purchased more than 750 shares of Stiefel Labs' stock through the Plan at the artificially low price of $13,012 a share.  The sellers of the stock were predominately employees who resigned, died, or were terminated.  The Defendants knew this price was artificially low because

the five investment firms had submitted offers to buy stock in November 2006 based on equity valuations that were significantly higher than this valuation.

## 2.      2007 Valuation

25.     In 2007, Stiefel Labs reinitiated the process of seeking a private equity investment. Around that time, Blackstone Healthcare Partners LLC ("BX Healthcare"), a subsidiary of The Blackstone Group LP, one of the five investment firms referenced above, expressed an interest in acquiring Stiefel Labs and repeatedly communicated with Stiefel regarding an acquisition. Stiefel Labs refused to sell the whole company to BX Healthcare.

26.     Instead, the Company received offers to buy Stiefel Labs preferred shares from BX Healthcare and TA Associates, Inc. In July 2007, the investment firm TA Associates submitted an indication of value outlining a $300 million investment based on an equity value of approximately $2 billion. Around that time, the Company also received an offer to sell preferred shares from BX Healthcare. Ultimately, in August 2007 the Company accepted BX Healthcare's offer and BX Healthcare invested $500 million in Stiefel Labs. This investment represented approximately a 19% interest in Stiefel Labs based on the Company's equity being worth approximately $2.6 billion. For its investment, BX Healthcare acquired convertible preferred stock with a guaranteed annual dividend, a provision allowing it to appoint at least one Stiefel Labs director, and liquidation preferences.

27.     On or about September 25, 2007, the Defendants retained the third-party accountant to perform the share valuation. On December 6, 2007, Stiefel, as Chairman, CEO and President of Stiefel Labs, emailed to all present and future participants in the Plan that he was pleased to announce to his fellow shareholders that the annual valuation had determined their shares were each worth $14,517 a share as of March 31, 2007.

28.     However, the Defendants failed to disclose to the accountant and to most shareholders (except to certain members of the Stiefel family and certain senior executives) the offers from the five prominent investment firms in 2006, BX Healthcare's offer to buy Stiefel Labs, the $1.9 billion equity valuation the Company received in July 2007, and BX Healthcare's purchase of 19% of the Company.   The Defendants should have disclosed these offers and valuations because they would have alerted shareholders that their shares were worth much more than reported.

29.     From at least July 2007 through June 2008, Stiefel Labs purchased more than 350 shares of stock through the Plan at $14,517 a share.   In addition, the Company purchased more than 1,050 shares of stock outside of the Plan at a further discount ranging from 9.6% (purchase price of $13,113 a share) up to 29.5% (purchase price of $9,170 a share) of the already artificially low price of $14,517 a share.   At the time of these buybacks, the Defendants knew about the five investment firms' equity valuations, BX Healthcare's offer to buy Stiefel Labs, and the equity valuation of BX Healthcare and another investment firm.

### 3.     2008 Valuation

30.     On October 14, 2008, Stiefel, as Chairman, CEO and President of Stiefel Labs, emailed to all present and future participants in the Plan that he was pleased to announce to his fellow shareholders that their shares were each worth $16,469 as of March 31, 2008.

31.     A month later, Stiefel Labs' senior management and board determined the Company was at risk of violating debt covenants.   As a result, in November 2008, Stiefel Labs' executive leadership team, Stiefel and his sons, voted to implement various austerity measures.

32.     Even though the Company was implementing these austerity measures, on November 19, 2008, Stiefel Labs, for the first time in its history, announced it would buy back stock from current Stiefel Labs employees.   Prior to this change to the Plan, only employee

9

shareholders who retired, were terminated, or otherwise departed from Stiefel Labs could sell their stock. Stiefel Labs claimed to employee shareholders it was making changes to its retirement plans to give vested participants more control, flexibility, and opportunities to manage their retirement planning through diversification. Stiefel Labs scheduled presentations in which the benefits of diversification were touted to employee shareholders. In reality, this change allowed the Company to acquire more stock at artificially low prices. The remaining shareholders, such as Stiefel and his family, also stood to make even more money when the Company was sold.

33. On November 21, 2008, Stiefel Labs announced that current employees could sell their stock from February 1, 2009 to March 1, 2009. On December 19, 2008, the Company moved up this period from January 12, 2009 to February 2, 2009.

### i. While Aggressively Buying Back More Shares, the Defendants Seek to Sell the Company for Billions of Dollars

34. On November 26, 2008, following an expression of interest by Sanofi, a large pharmaceutical company, to purchase Stiefel Labs a few days earlier, Stiefel decided to begin seeking bids and terms from potential acquirers, including companies that previously expressed an interest in buying Stiefel Labs. That same day, Stiefel also asked BX Healthcare if it would be willing to waive a guaranteed return on its investment if Stiefel Labs were to be sold before August 2009. BX Healthcare ultimately said no. During that conversation, a BX Healthcare managing director advised Stiefel Labs to expect a sale price of $3 to $5 billion.

35. While Stiefel Labs was seeking bids and negotiating its sale, on December 1, 2008, for the first time in the Company's history, it implemented a long-term incentive plan. Stiefel and his sons agreed to put in place incentive plan agreements for sixteen senior executives, including themselves, with golden parachutes and gave them more stock. This incentive plan

agreements also gave Stiefel, his wife, and two sons the right to compel individuals who received shares from this plan to consent to the sale of Stiefel Labs.

36.     Shortly after obtaining more shares of stock and giving himself a golden parachute, Stiefel accelerated his efforts to sell the Company.  The following chronology of events occurring from December 2008 through March 2009, highlights key developments in Stiefel's negotiations to sell the Company:

a.  On December 8, 2008, Stiefel met with BX Healthcare and BX Advisory Services LP ("BX Advisory"), another Blackstone subsidiary, regarding strategic options.  Among other things, they discussed potential purchase prices for Stiefel Labs, and BX Advisory advised Stiefel Labs to expect a sale price of $2.25 to $4 billion.  After the meeting, Stiefel and others discussed how much money shareholders would receive if a corporation acquired Stiefel Labs for $3 billion.  In an email, Brent Stiefel, at the time Chief of Pharmaceutical Operations for Stiefel Labs and one of Stiefel's sons, stated to his father and to a managing director of BX Healthcare that Stiefel Labs should not be sold for less than $3 billion.

b.  On December 22, 2008, Stiefel and BX Healthcare met with Sanofi's CEO and financial advisor about a possible sale.  Sanofi's financial advisor had created a detailed valuation of Stiefel Labs, which BX Healthcare interpreted as a sign of Sanofi's serious intent to acquire the Company.  Sanofi's CEO and Stiefel discussed specific plans, including keeping Stiefel Labs' management team on board, keeping Stiefel Labs in Florida, and having Stiefel Labs manage other Sanofi dermatology divisions.  In December, Stiefel Labs also engaged BX Advisory to act as its financial advisor in connection with Stiefel Labs' sale.

11

c. On January 20, 2009, Stiefel emailed senior Stiefel Labs executives regarding his concern that an employee at an "All Hands" meeting, where numerous employee shareholders would be in attendance, might ask how determined the Company was to remain private. He suggested the questions be filtered before the meeting or to cancel the meeting. Subsequently, the meeting was cancelled.

d. By January 21, 2009, Sanofi had signed a confidentiality agreement with Stiefel Labs. A few days later, Stiefel asked BX Advisory to contact eight other potential acquirers, all large pharmaceutical companies.

e. On January 26, 2009, Glaxo's CEO expressed an interest in a potential Stiefel Labs acquisition, and Glaxo signed a confidentiality agreement two days later. Three days after that, Brent Stiefel instructed senior Stiefel Labs executives to slow down efforts aimed at establishing various partnerships because of the potential sale of Stiefel Labs.

f. On February 4, 2009, Stiefel sent an email to his sons concerning his compensation: "It would look really bad to have my 2 sons award me a whole bunch of additional stock right before a sale of the company at a stock price many times the price used to calculate my stock. This might be a windfall for me, but none of us need or want the potential scrutiny or maybe even lawsuits."

g. On February 5, 2009, Stiefel sent an email to his two sons and other senior executives, stating they should not announce the pending sales negotiations to employees unless there was a signed, binding contract. In that email, he stated that if employees inquired about rumors, executives should respond that: companies had been expressing interest in acquiring Stiefel Labs for decades; Stiefel Labs liked being private and independent; and

although management would have a fiduciary duty to listen to any compelling offer, in 162 years no one had made an offer the family had wanted to accept.

h.  On February 7, 2009, a senior executive at Novartis AG ("Novartis") stated in an email to BX Advisory that Novartis was interested in exploring a potential acquisition. Novartis signed a confidentiality agreement shortly thereafter.

i.  On February 13, 2009, Todd Stiefel, one of Stiefel's sons and the Company's chief strategy officer (who was responsible for, among other things, the finance department, and the CFO reported to him), emailed senior management, including Stiefel, to say that if they received questions from employees regarding a potential sale, they should, among other things, "blow it off as if it not an issue or as if it is plain silly" and if necessary, "flatly deny it."

j.  On February 14, 2009, Brent Stiefel emailed Stiefel and Todd Stiefel about how much they and their relatives could expect in payouts if the Company was sold at prices ranging from $2 to $5 billion.

k.  On February 16, 2009, Stiefel and Sanofi's CEO met to discuss a potential sale.

l.  On February 20, 2009, Brent Stiefel emailed his father, stating that because of the share buybacks from employee shareholders, "It is nice to see the $ go up for all of us!" On the same day, Brent emailed Stiefel and Todd Stiefel information showing how much more they and their relatives should expect to receive from a sale of the Company because of the buybacks from employee shareholders.

m.  By February 26, 2009, Stiefel Labs had made half-day management presentations to three potential acquirers.

13

n. On March 3, 2009, Stiefel Labs gave four potential bidders, including Glaxo, access to its electronic data room which contained non-public confidential information. Three days later, Stiefel Labs' management made a presentation to Glaxo.

o. On March 12, 2009, BX Advisory invited bids from and explained the bid procedures to four potential acquirers, including Glaxo, and Stiefel Labs' board, led by Stiefel, discussed the possibility of selling Stiefel Labs.

p. On March 16, 2009, Stiefel emailed his sons that "we don't need to tell people" about the potential sale. Rather, they should say Stiefel Labs was considering taking on an additional private equity investor.

q. On March 24, 2009, Glaxo and Sanofi submitted bids. Each of these bids valued the Company's equity at more than $2.7 billion.

### ii. After Aggressively Buying Back More Shares, the Defendants Sell the Company for Approximately $3 Billion

37. From at least December 2008 to April 2009, while Stiefel Labs was seeking bids and negotiating its sale, it bought more than 800 shares from current and former employee shareholders for $16,469 per share. This fraudulent scheme reduced the number of Stiefel Labs' outstanding shares and greatly enriched Stiefel Labs and the remaining shareholders - particularly the Stiefel family, as the majority shareholder - by depriving shareholders of their interest in their shares at artificially low prices.

38. Although Stiefel Labs was undergoing financial distress and was at risk of violating debt covenants in late January or early February 2009, Stiefel increased the budget to buy back stock from employee shareholders from $10 million to $14 million. This was so the Company could buy back all the shares employee shareholders sought to sell to the Company. By

14

buying back more shares, this further increased the potential benefits to the Defendants from the fraudulent scheme.

39.     During these buybacks, the Company's senior management knew, based on Blackstone Healthcare's analysis, that the Company's enterprise value was at least $3 billion.  In fact, Brent Stiefel made clear in an email the Stiefel family would not accept a sale for less.

40.     On April 20, 2009, Stiefel Labs publicly announced an agreement with Glaxo to acquire Stiefel Labs' outstanding shares for $2.9 billion and for Glaxo to assume $400 million in Stiefel Labs debt upon closing.  Furthermore, Stiefel Labs' remaining shareholders could receive an additional $300 million cash payment depending on future performance of the Company.

41.     On July 22, 2009, Glaxo paid Stiefel Labs $2.9 billion for its outstanding shares, and Stiefel Labs eventually paid most then-existing shareholders $68,131 per share under the Plan.  It paid $64,933 per share to non-Plan shareholders, such as the Stiefel family.  In addition, Glaxo deposited $100 million of the purchase price into an escrow account, that after a certain amount of costs are incurred, Stiefel Labs and Glaxo could potentially use to indemnify themselves for certain costs.  Presently, the $100 million remains in escrow.  If the escrow is not used it will go to non-Plan shareholders, such as the Stiefel family.

D.     **Defendants' Misleading Statements to Employee Shareholders**

(i.)     **Misleading Stock Valuations and Summary Plan Description**

42.     Stiefel Labs, through Stiefel, communicated misleading stock valuations to its employee shareholders in 2006, 2007, and 2008, and never corrected this information.

43.     First, for the 2006 through 2008 valuations, Stiefel misled shareholders about the method used to value their stock.  Stiefel informed the employee shareholders in an email that the process used to calculate the stock price consisted of three steps: (1) Stiefel Labs' accounting team consolidated the Company's financial results; (2) Stiefel Labs' outside accountants audited

the financial results; and (3) a third party analyzed the financial results and compared various financial ratios and data points to those of comparable public companies using a comparative fair market value method.  However, the Defendants did not inform the vast majority of employee shareholders that after the value of Stiefel Labs' stock was determined using this three-step process they discounted the stock by an additional 35%.  This undisclosed 35% discount further depressed the prices shareholders received for their shares and should have been disclosed.

44.     Second, for the 2006 through 2008 valuations, the Defendants failed to update the valuations for significant events occurring after the dates of the valuations.  In addition, for the 2007 through 2008 valuations, the Defendants failed to consider significant events that occurred before the valuations were issued.  For example, the Defendants did not take into consideration or update the valuations with:  (1) the five private equity firms' valuations from 2006, a private equity firm's offer to buy Stiefel, two private equity firms' valuations from 2007, or that a private equity firm had invested $500 million in Stiefel Labs in August 2007 based on an equity valuation that was more than 300% higher than the valuation used for the buyback program; or (2) that Stiefel Labs had become actively engaged in material discussions to sell the Company.

45.     Third, for the 2006 valuation from November 2006 to April 2007, Stiefel reported stock valuations to employee shareholders that were misleading because they did not take into consideration that five prominent private equity firms had offered to invest in Stiefel Labs based on equity valuations of the Company, which were significantly higher than the equity valuation Stiefel announced to shareholders.  Only the Stiefel family and a few senior executives had access to this information and the Defendants did not disseminate this information to the vast majority of shareholders.

16

46. Fourth, for the 2007 valuation from late July 2007 to June 2008, Stiefel reported stock valuations to employee shareholders that were misleading because they did not take into consideration the five private equity firms' valuations from 2006, a private equity firm's offer to buy Stiefel, two private equity firms' valuations from 2007, and that a private equity firm had invested $500 million in Stiefel Labs in August 2007 based on an equity valuation that was more than 300% higher than the valuation used for the buyback program.  Only the Stiefel family and a few senior managers had access to this valuation information and the Defendants did not disseminate this information to the vast majority of shareholders or to the third party Stiefel Labs retained to value its stock.

47. Fifth, for the 2008 valuation from December 2008 to April 1, 2009, Stiefel reported stock valuations to employee shareholders that were misleading because they did not take into consideration:  (1) the five private equity firms' valuations from 2006, a private equity firm's offer to buy Stiefel, two private equity firms' valuations from 2007, and that a private equity firm had invested $500 million in Stiefel Labs in August 2007 based on an equity valuation that was more than 300% higher than the valuation used for the buyback program; and (2) that Stiefel Labs had become actively engaged in material discussions, including receiving offers, to sell the Company.  Only the Stiefel family and a few senior executives had access to this information and did not disclose it to shareholders or to the third party Stiefel Labs retained to value its stock until after April 20, 2009.

48. Finally, the Plan effective as of April 1, 2005 and signed by Stiefel, as President of Stiefel Labs, on March 23, 2006, and the Summary Plan Description, signed by Stiefel, as Trustee of the Plan, in March 2006, that Defendants gave or made available to employee shareholders were materially misleading.   Stiefel Labs repeatedly instructed employees to consult the

17

Summary Plan Description if they had questions about the Plan.  These documents informed shareholders they could sell to the Company the common stock distributed to them for its "current fair market value."  Hence, the Company had a duty to purchase the stock from its shareholders at its "current" market value.  The Plan also stated the trustee was expected to determine the stock's fair market value "from time to time as may be necessary for any purpose under the Plan...."  Even though Stiefel had a duty under the Plan, and the law, to determine the fair market value of the stock, and told employees they would receive the fair market value of their stock, he did not request the third party to perform new valuations or provide the third party with significant information.  Rather Stiefel Labs consistently bought back shares at the previously announced stock prices, which were outdated and undervalued.

### (ii.)    Defendants' Misleading Response to Wall Street Journal Article

49.    On March 20, 2009, the Wall Street Journal published an article stating Stiefel Labs was for sale, mentioning multiple potential acquirers, and a price range of $3 to 4 billion.  After the article was published, Stiefel Labs, through Todd Stiefel, sent an email to all employees stating the Company had not received any offers.  The email did not mention the ongoing sales process or that the Company had been seeking bids from potential acquirers since at least November 2008.  An attachment to this email also downplayed Blackstone's role, only stating Blackstone was involved because it was a minority shareholder.  It failed to mention the Company had retained Blackstone as a financial advisor in late 2008.  Stiefel Labs also posted this email and attachment on its website.  This email and the documents posted on Stiefel Labs' internal corporate website that strongly indicated the Company would not be sold, were the only information available to most employees until April 2009.

### E.      Stiefel's Integral Role in the Fraud

50.      During the relevant time period, Stiefel made numerous misrepresentations and omissions to Stiefel Labs' shareholders, including providing artificially low valuations given to shareholders.  As the controlling shareholder, chairman and CEO of the Company, trustee of the Plan, and member of the Plan Committee that oversaw the operations of the Plan, Stiefel had the ultimate authority to make these statements and authored many of the misleading communications given to shareholders.

51.      Stiefel knew about the offers and valuations placed on the Company that were much higher than the misleading stock valuations given to shareholders in 2006, 2007, and 2008, because he retained the financial advisors that received the offers and valuations or he directly received this information.  Stiefel also knew the third party the Company retained to value its stock did not receive this information.  As the trustee and member of the Plan Committee, Stiefel had the responsibility to determine in good faith the fair market value of the shareholder's common stock.

## V.      VIOLATIONS

### COUNT I

### Fraud in Violation of Section 10(b) and Rule 10b-5 of the Exchange Act

#### (Against All Defendants)

52.      The Commission repeats and realleges its allegations set forth in paragraphs 1 through 51 of this complaint as if fully restated herein.

53.      From November 2006 to April 2009, Defendants Stiefel Labs and Stiefel, directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of securities, as described herein, have knowingly, willfully, or extremely recklessly: (i) employed devices, schemes or artifices to defraud; (ii) made

untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices and courses of business which have operated, are now operating, and will continue to operate as a fraud or deceit upon any person.

54.     By reason of the foregoing, Stiefel Labs and Stiefel, directly and indirectly, violated and, unless enjoined, will continue to violate Section 10(b) and Rule 10b-5 of the Exchange Act. [15 U.S.C. § 78j(b) & 17 C.F.R. § 240.10b-5].

## COUNT II

### Aiding and Abetting Violations of Section 10(b) and Rule 10b-5 of the Exchange Act
### (Solely Against Stiefel)

55.     The Commission repeats and realleges its allegations set forth in paragraphs 1 through 51 of this complaint as if fully restated herein.

56.     From November 2006 to April 2009, Defendant Stiefel Labs directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of securities, as described herein, has knowingly, willfully, or recklessly: (i) employed devices, schemes or artifices to defraud; (ii) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices and courses of business which have operated, are now operating, and will continue to operate as a fraud or deceit upon any person.

57.     Defendant Stiefel, knowingly or recklessly, provided substantial assistance to Stiefel Labs in connection with its violations of Section 10(b) and Rule 10b-5 of the Exchange Act. [15 U.S.C. § 78j(b) & 17 C.F.R. § 240.10b-5].

20

58.     By reason of the foregoing, Defendant Stiefel aided and abetted Stiefel Labs'
violations of Section 10(b) and Rule 10b-5 of the Exchange Act.  [15 U.S.C. § 78j(b) & 17 C.F.R.
§ 240.10b-5].

## VI.      RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court:

### I.

### Declaratory Relief

Declare, determine and find that Defendants Stiefel Labs and Stiefel, have committed the
violations of the federal securities laws alleged in this complaint.

### II.

### Permanent Injunctive Relief

Issue a Permanent Injunction enjoining Defendants Stiefel Labs and Stiefel, their agents,
sales agents, servants, employees, attorneys, and all persons in active concert or participation with
them, and each of them from violating, directly or indirectly, Section 10(b) of the Exchange Act
[15 U.S.C. § 78j(b)]; and Rule 10b-5 thereunder.  [17 C.F.R. § 240.10b-5].

### III.

### Officer and Director Bar

Issue an Order pursuant to Section 21(d)(2) of the Exchange Act (15 U.S.C. § 78u(d)(2)),
barring Stiefel from acting as an officer or director of any issuer that has a class of securities
registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to
Section 15(d) of the Exchange Act.

## IV.

### Disgorgement

Issue an Order directing Defendants Stiefel Labs and Stiefel to disgorge all ill-gotten profits or proceeds resulting from the violations alleged in this complaint, with prejudgment interest.

## V.

### Civil Penalties

Issue an Order directing Defendants Stiefel Labs and Stiefel to pay civil money penalties pursuant to Section 21(d) of the Exchange Act.  [15 U.S.C. § 78(d)(3)].

## VI.

### Further Relief

Grant such other and further relief as may be necessary and appropriate, including, but not limited to, relief under the Sarbanes-Oxley Act of 2002 and Section 21(d) of the Exchange Act for any equitable relief that may be appropriate or necessary for the benefit of investors.

## VII.

### Retention of Jurisdiction

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may hereby be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

Respectfully submitted,

December 12, 2011                    By: _____

Christopher E. Martin
Senior Trial Counsel
SD Fla. Bar No. A5500747
Direct Dial: (305) 982-6386
Email: martinc@sec.gov

Drew D. Panahi
Senior Counsel
SD Fla. Bar No. A5501196
Direct Dial: (305) 416-6295
Email : panahid@sec.gov

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1800
Miami, Florida  33131
Telephone: (305) 982-6300
Facsimile:  (305) 536-4154